UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:15-CR-00046 (VAB) |
| | : | |
| v. | : | |
| | : | |
| BRIAN MOORE | : | November 13, 2015 |

## THE GOVERNMENT'S SENTENCING MEMORANDUM

This memorandum is submitted in aid of the defendant's sentencing scheduled for November 23, 2015.  As discussed herein, Mr. Moore pleaded guilty based on his role in helping organize and carry out a smash-and-grab robbery of Sidney Thomas Jewelers in Stamford, Connecticut in November 2014.  During the robbery, three of Mr. Moore's accomplices, some of whom he enlisted, walked into Sidney Thomas Jewelers armed with hammers, smashed open a display case, and took over $250,000 worth of Rolex watches.  They carried out this brazen robbery in the presence of store employees and during the start of the busy holiday season.  Moreover, information obtained by the Federal Bureau of Investigation ("FBI") indicates Mr. Moore has been involved in other jewelry store robberies as well.

Given the seriousness of the offense, the defendant's apparent involvement in other robberies and his prior criminal history, and the need for the sentence imposed to deter the defendant and others from committing similar crimes, promote respect for the law, and provide just punishment, the Government respectfully requests a sentence of 71 months' imprisonment, which is at the top of the advisory guidelines range.

**I.  BACKGROUND**

    A.  Procedural Background

Mr. Moore was initially arrested on March 17, 2015 pursuant to a criminal complaint charging him with Conspiracy to Interfere with Commerce by Robbery, in violation of Title 18, United States

Code, Section 1951(a).  A federal Grand Jury later returned a two count indictment charging him with Conspiracy to Interfere with Commerce by Robbery, in violation of Title 18, United States Code, Section 1951(a) (Count One) and Interference with Commerce by Robbery, in violation of Title 18, United States Code, Section 1951(a) and 2 (Count Two).  Both counts carry a maximum penalty of twenty years' imprisonment and a $250,000 fine.

On August 31, 2015, Mr. Moore pleaded guilty to Count Two of the Indictment.

B.      Offense Conduct[1] and Additional Information Relevant to Sentencing

In summary, during the early morning hours of November 26, 2014, Mr. Moore picked up several associates – including co-defendant Dajuhn Griffin and Richard Bailey – in a van and travelled east from Detroit, Michigan all the way to Stamford, Connecticut in order to carry out a pre-planned robbery of Sidney Thomas Jewelers.  Mr. Moore had previously solicited participation of members of the crew and helped to organize the robbery.  Along the way, he paid for expenses.

After arriving in Stamford, Mr. Moore and others located a Jeep SUV, broke into it, and hotwired the ignition.  Three members of the robbery crew then used the stolen Jeep to travel to the Stamford Town Center Mall.  Mr. Moore remained behind in the van in which he and others arrived.

At approximately 5:50 p.m., during prime business hours, the three who had arrived at the mall in the Jeep cavalierly walked into Sidney Thomas Jewelers and directly toward a set of display cases.  A moment later, as captured by a store security camera, they took out hammers and began striking the protective glass tops of two of the display cases.  Upon hearing the loud smashing sounds and seeing events unfolding in the store, terrified employees retreated in hope of finding safety away from the

---

[1] Mr. Moore's offense conduct is set forth in further detail in the Pre-Sentence Report ("PSR").

suspects.[2] After successfully smashing the top panel of a display case with the hammers, the three peeled back the protective glass and took fifteen Rolex watches from within.

A mall security guard was present outside the store during the robbery. According to the security guard, he became suspicious as the suspects passed by him and entered the store. One of the suspects said "what's up" to him and had his hand concealed in his pocket in a way that caused concern and suggested the suspect may have had a weapon. Once the guard saw the robbery begin, he requested back up and dispatch of police. He also moved away from the store entrance out of fear for his safety.

Shortly after grabbing the watches from the smashed display case, the three males fled from the store out into the mall atrium and ran in different directions. One of the males ran by the same security guard who had been standing near the entrance before the robbery. As the suspect passed, he had his hand in his pocket and uttered "go ahead," which the security guard perceived as a taunt and suggestion that he may have had a weapon concealed.

Two of the suspects escaped out mall exits. A third suspect, later identified as Richard Bailey, attempted to run up an escalator. Another security guard grabbed and subdued him after a brief struggle. A search revealed that he had in his possession several Rolex watches. Bailey was taken to a security area and later placed under arrest by members of the Stamford Police Department. Later on, the stolen Jeep SUV was found in the parking garage of the mall. It was left running with its ignition removed.

Sidney Thomas Jewelers indicated that the total value of the watches removed from the display case was $254,300. Of the fifteen watches, eight have never been recovered; seven were recovered,

---

[2] When later interviewed by a Special Agent with the Federal Bureau of Investigation ("FBI"), one of the store employees who was present stated that she was terrified for her and others' safety and that she experienced a panic attack as a result of the robbery.

each of which remain in evidence.  Five of the recovered watches were found on Bailey.  Two were dropped and damaged while the suspects fled.  Store display cases were also heavily damaged during the robbery.  *See* Exhibit A, Crime Scene Photographs from Sidney Thomas Jewelers.

Following the robbery, the FBI learned of Mr. Moore and Dajuhn Griffin's participation.  Call detail records for Mr. Moore's cellular telephone verified that he had been in touch with members of the robbery crew multiple times on the day of the robbery.  Cell tower approximate location data also showed that he had travelled from Detroit to Stamford on the day of the robbery, remained present in the vicinity of the Stamford Town Center Mall around the time of the robbery, and travelled back to Detroit immediately following the robbery.

During the ensuing investigation, the FBI also obtained information from a cooperating witness and from other law enforcement agencies implicating Mr. Moore in two additional smash-and-grab robberies.  These include a robbery in Lone Tree, Colorado (near Denver) in July 2014 and another in Virginia Beach, Virginia in August 2014.  Regarding the Colorado robbery, the FBI obtained still pictures from security camera footage from Ben Bridge Jewelers clearly showing Mr. Moore and several other males walking around the interior of the jewelry store the day before it was robbed.  *See* Exhibit B, Lone Tree Police Department Bulletin.  When the store was robbed the next day, events unfolded in nearly an identical way as the robbery of Sidney Thomas Jewelers in Stamford.  Several males entered the jewelry store, located inside a mall, smashed open display cases with hammers, and took over a dozen Rolex watches.  Following the robbery, the males fled the store and jumped into a waiting Jeep SUV, which had been stolen a short time before.  The stolen Jeep SUV was later recovered in the parking lot of a nearby hotel, suggesting that the suspects jumped out and into another waiting get-away vehicle.  Consistent with the security camera footage pictures, a cooperating witness

also stated based on first-hand knowledge that Mr. Moore was present in the store the day before to "case" the location in preparation for the robbery, and that Mr. Moore helped organize and carry out the robbery the following day.

Mr. Moore was also involved in a robbery of Reeds Jewelers in Virginia Beach, Virginia in August 2014 according to the cooperating witness. There too three males entered the jewelry store, smashed open display cases, and stole Rolex watches from within. Following the robbery, they fled to a waiting SUV which was later recovered and determined to be stolen. According to the cooperating witness, Mr. Moore helped organize this robbery and solicited participation in other planned jewelry store robberies in Georgia, New Jersey, and elsewhere as well.

On March 17, 2015, the FBI arrested Mr. Moore at his home in Detroit, Michigan. Following his arrest, Mr. Moore waived his Miranda rights and consented to an interview. Mr. Moore denied that he had ever travelled to Colorado or Connecticut, except possibly as part of a college basketball team to play there sometime before 2010. Later on in the interview, the FBI Special Agent who was conducting the interview confronted Mr. Moore about the images of him captured on store security camera footage from Ben Bridge Jewelers in Lone Tree, Colorado in July 2014. Mr. Moore then conceded that he had in fact travelled to Colorado around that time. Mr. Moore, however, claimed he had travelled alone from Detroit to Colorado in order to visit a friend and to purchase marijuana from a dispensary. He stated that he and his friend had at some point visited the jewelry store to look at sunglasses, but he said he was unaware the store was robbed and denied knowing anything about the robbery.

With respect to the robbery of Sidney Thomas Jewelers in Stamford, Mr. Moore maintained that he had not travelled to Connecticut. After continued questioning, he acknowledged knowing

Richard Bailey, and stated that he was aware Bailey had been arrested in connection with a robbery in Connecticut. Upon further questioning, Mr. Moore ultimately admitted that he had travelled to Connecticut on November 26, 2014, contrary to his earlier claims. According to Mr. Moore, he traveled there with a group of males solely to purchase iPhones from an Apple Store, which he planned to resell. Mr. Moore later revised his account again, claiming that at some point he learned the group planned to commit a robbery. Mr. Moore, however, insisted that he left upon learning their plans.

On August 31, 2015, in connection with his entry of a guilty plea for his role in the Stamford robbery, Mr. Moore ultimately admitted that he had "aided and abetted the commission of the robbery [of Sidney Thomas Jewelers] by soliciting the participation of accomplices, partially funding expenses associated with the robbery, and by transporting accomplices between Detroit, Michigan and Stamford, Connecticut in order to carry out the robbery." Plea Agreement, Stipulation of Offense Conduct, Docket No. 71.

    C.    <u>Guidelines Calculation</u>

The parties agree that Mr. Moore's base offense level under U.S.S.G. § 2B3.1(a) is 20. Three levels are added because dangerous weapons, here hammers, were possessed and brandished during the robbery, U.S.S.G. § 2B3.1(b)(2)(E), three levels are added because the loss resulting from the robbery exceeded $250,000, U.S.S.G. § 2B3.1(b)(7)(D), and two levels are added because the defendant was an organizer, U.S.S.G. § 3B1.1(c). After subtracting three levels for acceptance of responsibility, under U.S.S.G. § 3E1.1, Mr. Moore's total adjusted offense level is 25. Mr. Moore falls within Criminal History Category I.

A total adjusted offense level of 25 together with a Criminal History Category I yields an advisory guidelines range of 57 to 71 months' imprisonment (sentencing table) and a fine range of

$10,000 to $100,000 (U.S.S.G. § 5E1.2(c)(3)).  The defendant is also subject to a supervised release term of at least one but not more than three years under U.S.S.G. § 5D1.2.

        D.        Restitution

In addition to the other penalties provided by law, the Court must order that the defendant make restitution under 18 U.S.C. § 3663A.  *See also* U.S.S.G. § 5E1.1.  As set forth in the Plea Agreement, Mr. Moore will be jointly and severally liable with his co-defendants for restitution.

At this time, the Government has requested but not yet received additional information from Sidney Thomas Jewelers which is material to determining any potential restitution, including whether its insurance company may be entitled to some portion as a secondary victim.  Accordingly, the Government respectfully requests a continuance of a date for determining restitution to a time not exceeding 90 days following sentencing.  *See* 18 U.S.C § 3664(d)(5).

**II.**        **GOVERNING LAW**

Although application of the United States Sentencing Guidelines is no longer mandatory, *see United States v. Booker*, 543 U.S. 220 (2005), in each case, "the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a)" in arriving at a reasonable sentence. *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements.").  Thus, the sentencing court must now first determine the applicable Guidelines range (including any departures), and thereafter, determine whether in light of the Guidelines and the other factors listed in section 3553(a), there is any reason to impose a non-Guidelines sentence.  As the Second Circuit explained, "*Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be

consulted or overlooked at the whim of a sentencing judge." *Crosby*, 397 F.3d at 113. Both the Supreme Court and the Court of Appeals expect "sentencing judges faithfully to discharge their statutory obligation to 'consider' the Guidelines and all of the other factors listed in section 3553(a), . . . and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice." *Crosby*, 397 F.3d at 113-114.

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In *United States v. Crosby*, 397 F.3d at 111-13, the Second Circuit explained that, in light of *Booker*, district courts should now engage in a three-step sentencing procedure.  First, the district court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence."  *Crosby*, 397 F.3d at 111-12; *see also United States v. Salazar*, 489 F.3d 555, 557 (2d Cir. 2007) (post-*Booker* district courts maintain a statutory obligation to consider the Guidelines).  Second, the district court should consider whether a departure from that Guidelines range is appropriate.  *Crosby*, 397 F.3d at 112.  Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to be imposed.  *Id.* at 112-13; *see also United States v. Salazar*, 489 F.3d at 557 (holding, "the discretion afforded district judges by *Booker* applies to their consideration of the Guidelines range as one of the § 3553(a) factors *after* that range has been calculated") (emphasis in original).  The fact that the Sentencing Guidelines are no longer mandatory does not reduce them to "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."  *Crosby*, 397 F.3d at 113.  A failure to consider the Guidelines range and to instead simply select a sentence without such consideration is error.  *Id.* at 115; *see also United States v. Cuevas*, 496 F.3d 256, 265 (2d Cir. 2007) (explaining district courts have a duty "to consider the applicable Guidelines range, in addition to the other factors listed in 18 U.S.C. § 3553(a), in determining the appropriate sentence").

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court explained that "[b]ecause the Guidelines are now advisory, appellate review of sentencing decisions is limited to determining whether they are 'reasonable' [citation omitted] and an abuse of discretion standard applies. . . ."  *Gall*, 552 U.S. at 45.  Further, a district judge "may not presume that the Guidelines range is reasonable but

must make an individualized assessment based on the facts of the case." *Id*.  In so doing, the sentencing judge "must consider the extent of any departure from the Guidelines and must explain the appropriateness of any unusually lenient or harsh sentence with sufficient justifications." *Id*.

## III. DISCUSSION

The Government respectfully requests that the Court sentence Mr. Moore to a term of incarceration of 71 months, which is at the top of the applicable guidelines range, followed by a three year term of supervised release.  The Government believes a sentence at the top of the applicable guidelines range is appropriate in light of the seriousness of the offense, the defendant's criminal record and apparent involvement in other robberies, and the need for the sentence imposed to deter the defendant and others from committing similar crimes, promote respect for the law, and provide just punishment.  The Government does not seek imposition of a fine; it does, however, intend to request restitution at a later date if provided an opportunity by the Court.

### A. Seriousness of the Offense

The instant offense is extremely serious.  Mr. Moore is responsible for helping to organize and carry out a brazen smash-and-grab robbery that resulted in substantial losses to Sidney Thomas Jewelers.  Mr. Moore's accomplices, including those he enlisted, took over $250,000 dollars' worth of Rolex watches.  In the process, they caused substantial damage to two display cases and disrupted business at the start of the busy holiday shopping season.   These losses are not easily absorbed.  They have a real and significant financial impact on owners, investors, and employees.  Widely publicized criminal events like the robbery of Sidney Thomas Jewelers are also bad for business, particularly for stores in malls and downtown areas, where customers may be deterred from future shopping out of concern for their own safety.

Moreover, the conduct of Mr. Moore and his accomplices demonstrates a gross and reprehensible disregard for the safety of store employees, customers, and other members of the public. A stretch of imagination is not required to foresee the multitude of scenarios that could have resulted in serious injury to someone during the course of the robbery. What would have happened had the security guard intervened? Would one Mr. Moore's accomplices – perhaps whoever taunted the security guard to "go ahead" – have bludgeoned him in response? Mr. Moore, who solicited participation and helped organize the robbery, readily accepted this risk.[3] What if the police had seen the getaway van? Would a dangerous pursuit through densely populated downtown Stamford have ensued?

No less serious are the emotional impacts the robbery has had. As noted in the PSR ¶ 20, one of the store employees reported that she was "extremely frightened and fearful for their safety," and she suffered a panic attack as a result of the robbery. While she and others were fortunate to be spared physical injury, the aftermath of such an event leaves behind persisting emotional repercussions. Experiencing a terrifying event in the workplace compromises a person's sense of wellbeing and personal security. And these effects are rarely confined to the workplace; they tend to impact a person in all aspects of their daily lives. Coming from Detroit, Mr. Moore is no stranger to the impact of violence or the fear of becoming a victim of violence. He himself suffered the trauma of losing his brother to an act of violence. PSR ¶ 48. Nonetheless, he went ahead and subjected others to a considerable risk of harm and emotional trauma all in order to enrich himself at their expense.

---

[3] This risk was more than a mere hypothetical possibility. Two of Mr. Moore's accomplices who entered the store and carried out the robbery – co-defendant Dajuhn Griffin and Richard Bailey – have criminal pasts that demonstrate a propensity for violence. Mr. Griffin's record reflects juvenile convictions for armed robbery and a weapons offense. Mr. Bailey was convicted of robbery and carrying a concealed weapon without a permit. Both Griffin and Bailey have also pleaded guilty to charges stemming from the robbery of Sidney Thomas Jewelers.

The manner the robbery was carried out further highlights the seriousness of the offense and justifies a sentence at the top of the guidelines range. In order to facilitate the brazen smash-and-grab robbery, Mr. Moore and his accomplices committed another felony crime: they broke into a Stamford resident's Jeep SUV, hotwired the ignition, and absconded with the vehicle in order to facilitate the robbery. They also chose a target store several states away, likely to complicate investigation by authorities and reduce the risk that they would be caught. These measures, in addition to elevating the seriousness of the instant offense, are indicative of criminal sophistication and know-how. They are hallmarks of a group skilled in committing crimes.

In light of the serious nature of the instant offense, a sentence at the top of the guidelines range is warranted.

  B.  History and Characteristics of the Defendant

A sentence at the top of the guidelines range is also warranted based on Mr. Moore's background and characteristics, criminal history, and apparent involvement in other robberies

Mr. Moore's background and the circumstances of the instant offense reveal troubling aspects of his character. By all accounts, it appears Mr. Moore had a fairly stable upbringing. He grew up in the same home where he currently resides, and he had the benefit of a loving, supportive mother and grandmother. PSR ¶ 51-53. No doubt, the loss of Mr. Moore's brother in 2009, PSR ¶ 48, must have been tremendously difficult for him. It may partly explain his persistent use of marijuana, PSR ¶ 53, but it does not explain his decision to commit robbery. Rather, it appears Mr. Moore acted purely out of greed and lack of respect for the property and well-being of others.

The Government recognizes that Mr. Moore's friends and family speak highly of him. *See* Exhibits to Def. Sentencing Memorandum. It may be that he shows kindness and consideration to

those who are close to him, but his criminal conduct demonstrates that those attributes do not extend beyond his circle of family and friends.  His actions also call into serious question the character and integrity some of his family and friends cite when describing him.

In addition, the nature of Mr. Moore's criminal history, although relatively limited compared to some defendants who come before the Court, suggests a troubling and enduring nexus to violent crime.  As noted in the PSR, Mr. Moore was convicted in 2011 of Assaulting/Resisting/Obstructing a Police Officer.[4]  PSR ¶ 39.  According to a police report, he was part of a group involved in an altercation that lead to gunshots in the parking lot of a mall in Michigan.  A security guard who observed some of the events directed police to a Monte Carlo vehicle with four occupants.  Mr. Moore was operating the vehicle at the time.  The guard had seen one of the occupants in the rear of the vehicle toss a handgun under another car in the parking lot.  When officers approached, Mr. Moore reportedly put the vehicle in drive and began driving towards security officers.  Mr. Moore ignored loud verbal commands to stop, prompting one of the officers to block in the Monte Carlo with a police vehicle.  Once the Monte Carlo was "pinned in," officers removed Moore and others from the car.  This incident suggests that involvement in violence and criminal associations is not the exception for Mr. Moore, but rather an ongoing part of his life.

Most alarming, however, is Mr. Moore's apparent involvement in other robberies, indicating that the robbery of Sidney Thomas Jewelers was not an isolated incident.  As set forth above, the FBI obtained credible information implicating Mr. Moore in at least two other nearly identical pattern smash-and-grab robberies for which Mr. Moore has not been held accountable.[5]  *See* PSR ¶¶ 42-43.

---

[4] Mr. Moore's assertion that he "has never been in trouble before," made in his letter to the Court, Docket No. 80-4, is puzzling in light of this conviction and the events surrounding it.

[5] Mr. Moore's characterization of his role in the robbery of Sidney Thomas Jewelers as a "foolish decision that night" and a "single isolated incident," Docket No. 80-4, demonstrates that he

This information further supports a sentence at the top of the applicable guidelines range.[6] But for Mr. Moore's relatively limited (albeit still troubling) criminal history, an upward departure might very well be appropriate under the circumstances.

    C.    <u>Goals of Federal Sentencing: Deterrence, and Need to Promote Respect for the Law, Provide Just Punishment, and Protect the Public</u>

Mr. Moore is 26 years old, which is an age that places him beyond any credible claim of youthful indiscretion. The fact that he committed this crime well into his twenties raises significant concerns that he may be tempted to reoffend again in the future, even as he gets older. And although Mr. Moore's criminal history includes only one conviction for which he received probation, PSR ¶ 39, it is concerning that he progressed thereafter to committing a much more serious offense. This suggests recidivist tendencies that warrant a stringent sentence in order to deter him from committing other crimes in the future.

Moreover, the nature of the instant offense – a day-time robbery involving several participants and use of dangerous weapons – demonstrates that Mr. Moore presents a danger to the public. A lengthy sentence of incarceration will help protect the public by preventing Mr. Moore from endangering others by organizing and carrying out future robberies. The goal of promoting respect for

---

continues to minimize the seriousness and extent of his criminal conduct. It also seriously calls into question his honesty to the Court. As set forth *supra* at 4-5, Mr. Moore's involvement in robberies is not limited to a single "foolish decision" on one particular night. It appears to be the product of ongoing criminal involvement stretching across a lengthy period of time, none of which is logically explained away by the tragic loss of his brother to violence.

[6] Information relating to Mr. Moore's involvement in other uncharged robberies may appropriately be considered by the Court. The commentary to U.S.S.G. § 1B1.4 contemplates consideration of an unindicted offense when determining where to sentence a defendant within the guideline range. U.S.S.G. § 1B1.4. The example provided in the commentary is illustrative and on point: "For example, if the defendant committed two robberies, but as part of a plea negotiation entered a guilty plea to only one, the robbery that was not taken into account by the guidelines would provide a reason for sentencing at the top of the guideline range and may provide a reason for sentencing above the guideline range." *Id.*

the law also justifies a sentence at the top of the guidelines range. The brazen nature of the robbery, which occurred during business hours and at the start of the holiday shopping season, illustrates a striking disrespect for rule of law. The victims of Mr. Moore's criminal conduct and the public at large deserve a significant sentence to provide just punishment.

Finally, the goal of general deterrence is especially important here. Jewelry stores across the country witnessed a scourge of smash-and-grab robberies in 2014.[7] Many of these track back to robbery crews composed of multiple individuals based in and around Detroit. In aggregate, these robberies have resulted in hundreds of thousands of dollars in losses for businesses throughout the country. This is a prevalent, serious, and continuing problem. A sentence at the top of the guidelines range would send a pronounced deterrent message to others involved in carrying out robberies across the country and to persons who may be tempted to do so in the future.

## IV.     CONCLUSION

For the foregoing reasons, the Government believes that a sentence of 71 months' imprisonment, at the top of the applicable guidelines range, followed by a three year term of supervised release, appropriately balances all of the sentencing factors and is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

            Respectfully submitted,

            DEIRDRE M. DALY
            UNITED STATES ATTORNEY

            */s/ Gabriel J. Vidoni*
            GABRIEL J. VIDONI
            ASSISTANT UNITED STATES ATTORNEY

---

[7] In 2014, jewelry stores experienced numerous smash-and-grab robberies, many of which have traced back to suspects and current defendants who reside in and around Detroit. According to FBI data, at least 20 such robberies took place across states such as Mississippi, Maryland, New York, Nebraska, Connecticut, North Carolina, Georgia, Pennsylvania, Wisconsin, Florida, Massachusetts, Michigan, and Indiana. Federal prosecutions are currently pending in Detroit relating to a number of these robberies, and investigations remain ongoing.

                        Fed. Bar No. phv07016  
                        450 Main Street – Room 328  
                        Hartford, CT 06103  
                        (860) 947-1101

## **CERTIFICATION OF SERVICE**

I hereby certify that on November 13, 2015, the foregoing Government's Sentencing Memorandum was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

*/s/ Gabriel J. Vidoni*
GABRIEL J. VIDONI
ASSISTANT UNITED STATES ATTORNEY